Filed 12/3/14  In re J.G. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | D066011 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J512087G) |
| v. | |
| A.G., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Carol

Isackson, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and

Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Tahra C. Broderson, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego, Tilisha Martin, Carolyn Levenberg and Susan Lake for Minor.

A.G. (Mother) appeals an order granting a Welfare and Institutions Code[1] section 366.26 petition filed by the San Diego County Health and Human Services Agency (Agency) to terminate her parental rights to her daughter, J.G., and finding a permanent plan of adoption is appropriate for J.G. On appeal, Mother contends the evidence is insufficient to support the juvenile court's findings that (1) J.G. is adoptable, and (2) the beneficial parent-child relationship exception to termination of parental rights did not apply to preclude a permanent plan of adoption for J.G.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother is the mother of J.G., born in 2007. Dependency cases were filed regarding Mother's six older children based on domestic violence, substance abuse, and failure to protect them from physical abuse. Mother had a criminal history, including arrests for battery and inflicting corporal injury on a spouse or cohabitant. She did not reunify with her other children and her parental rights to most of them were terminated.

In July 2012, Agency investigated a report that J.G. had been endangered by Mother's domestic violence with her live-in boyfriend, A.S. Mother acknowledged she and A.S. engaged in a physical confrontation with a couple at a mall and, the following day, she and A.S. argued about the incident in J.G.'s presence. A.S. told police their argument involved scratching, biting, and punching. An officer saw injuries on A.S.'s

---

[1] All statutory references are to the Welfare and Institutions Code.

2

chest, neck, and arms. After Mother was arrested, she screamed, kicked the side of the patrol car, and deliberately hit her head against the car's windows and bars. Mother admitted she had a history of violence with the father of her older children. J.G. stated Mother and A.S. had argued many times in the past with their "words and hands."

Agency filed a section 300, subdivision (b), dependency petition to protect then-five-year-old J.G., alleging Mother and A.S. exposed her to violent confrontations and Mother had not reunified with her six other children based on her failure to protect them from domestic violence, physical abuse, and her substance abuse. At the detention hearing, the juvenile court ordered that J.G. be detained in out-of-home care and granted Mother supervised visitation with her. Thereafter, Mother attended weekly supervised visits with J.G.

At the September 2012 contested jurisdictional hearing on the petition, the court found the petition's allegations were true, removed custody of J.G. from Mother, and ordered reunification services for Mother. During the following six months, Mother participated in classes and received other reunification services, but reportedly was involved in another domestic violence incident with A.S. in October. In November, Mother tested positive for methamphetamine use and did not attend her drug treatment program in November and December. In October, J.G. was placed with her maternal grandmother, who thereafter supervised Mother's visits. Her grandmother reported Mother was under the influence of alcohol at an October visit.

At the March 2013 six-month review hearing, the court found it would be detrimental to return J.G. to Mother's care, found reasonable services had been provided

3

to Mother, and ordered that reunification services be provided to Mother for another six months. During the following six-month period, the maternal grandmother moved to Florida and J.G. was placed with her maternal aunt and uncle. The aunt reported J.G. was well-behaved and bright, and had adapted well to her new home and maternal cousins.

In April 2013, Mother married A.S. In May, A.S. was arrested for inflicting corporal injury on a spouse or cohabitant. Mother acknowledged another incident of domestic violence had occurred between them.

Mother's visitation with J.G. was consistent through May while she attended a parenting program, but became less regular thereafter. After A.S. was released from custody in August, Mother missed several visits with J.G. The maternal aunt reported the frequency of Mother's calls to J.G. went from daily to a couple of times per week and she visited more irregularly.

In June 2013, Mother was intoxicated when she attended a meeting with substance abuse treatment staff. In July, she did not submit to drug testing. In September, she was discharged from the outpatient treatment program for excessive absences. The maternal aunt told Agency that should J.G. not be returned to Mother, the aunt and uncle would prefer to adopt J.G. rather than assuming guardianship of her.

At the September 2013 contested 12-month permanency hearing, the juvenile court terminated Mother's reunification services and set a section 366.26 hearing regarding termination of her parental rights and selection of an appropriate permanent plan for J.G.

4

At the May 2014 contested section 366.26 hearing, the parties did not present any witnesses, and therefore the court considered only those documents admitted into evidence. The court considered the section 366.26 report of Agency social worker Dannielle Moores, along with the addendum thereto. Moores recommended that the parental rights of Mother to J.G., as well as those of J.G.'s alleged father(s), be terminated and a permanent plan of adoption be selected by the court. Moores concluded J.G. was adoptable because she was attractive, intelligent, in good health, and had a pleasant personality. J.G.'s maternal aunt and uncle wanted to adopt her, but did not want a guardianship. They had been cleared by Agency for J.G.'s placement, but had not yet been evaluated for adoption of J.G. However, Moores had no reason to believe they would not be approved to adopt J.G. Moores stated that "[i]n the unlikely event that they could not adopt [J.G.,] there are 50 approved adoptive families in San Diego County alone that have requested a child matching the characteristics of [J.G.]."

Moores reported there were times when Mother consistently visited J.G., but there were other times she did not consistently visit her. Several times, Mother showed up at the caregiver's home without first scheduling a visit. Mother began visiting and calling J.G. less often. Mother visited J.G. once in October and once in November. At a scheduled November visit, Mother arrived at the caregiver's home under the influence and was asked to leave. Mother did not visit J.G. in December 2013, January 2014, and February 2014. Mother missed a scheduled visit on March 18, 2014, and was late for her April 2 visit. Mother attended visits at Agency on April 17 and May 7.

5

When Moores observed the visits, Mother was affectionate with J.G. and gave her gifts. They shared snacks and played games. At the end of Mother's visits, J.G. reciprocated Mother's affection, but had no trouble separating from her.

In January 2014, J.G. reported being sad when Mother did not call or visit and that she missed Mother sometimes because she did not visit as often as she had previously. J.G. stated she wanted to stay in the care of her maternal aunt and uncle because she liked living with them. J.G. did not want to live with Mother and A.S. because they yelled and fought.

In recommending adoption as the permanent plan for J.G., Moores concluded none of the exceptions to adoption applied. J.G. had a relationship with Mother, but that relationship was not so strong that J.G. would suffer detriment if it ended. J.G. enjoyed seeing Mother during visits, but Mother was more like an aunt to her than a parent. Moores concluded J.G. needed a stable home to grow and develop normally. Mother had a long history of domestic violence and substance abuse and had not yet overcome those issues. Although maintaining contact with Mother would provide J.G. with some benefit, Moores believed that benefit would not outweigh the benefits J.G. would receive from a loving, safe, and stable adoptive home.

The court-appointed special advocate (CASA) reported she had interacted several times with J.G. and had observed her interactions with her maternal aunt and uncle. J.G. was flourishing in their home. They had a great relationship with J.G. and wanted to adopt her. During a November 2014 visit, Mother showed up intoxicated and cursed at

6

the caregiver. When J.G. told Mother not to say bad words, Mother replied: "I am an adult and can say whatever the fuck I want to say."

At the conclusion of the hearing, the juvenile court found it likely J.G. would be adopted were parental rights terminated, none of the exceptions to termination applied, and adoption was in J.G.'s best interests. Accordingly, the court terminated parental rights to J.G., found the permanent plan of adoption was appropriate, and referred her to Agency for adoptive placement. Mother timely filed a notice of appeal.

DISCUSSION

I

*Substantial Evidence to Support Court's Finding of Adoptability*

Mother contends the evidence is insufficient to support the juvenile court's finding that J.G. is adoptable.

A

"At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child. If the child is likely to be adopted, adoption is the plan preferred by the Legislature." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) "The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1060.) "[W]hat is required is clear and convincing evidence of the likelihood that the [child] will be adopted within a reasonable time either by the prospective adoptive family or some other family." (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844.) "The question of adoptability posed at a section 366.26 hearing

7

usually focuses on whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt that child. [Citation.] If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home. [Citation.] However, where the child is deemed adoptable based solely on the fact that a particular family is willing to adopt him or her, the trial court must determine whether there is a legal impediment to adoption." (*In re Carl R., supra,* at p. 1061.) "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650.) When a child is generally adoptable, "the suitability or availability of the caregiver to adopt is not a relevant inquiry." (*In re R.C.* (2008) 169 Cal.App.4th 486, 493.) On appeal, we apply the substantial evidence standard of review when considering an appellant's challenge to a juvenile court's determination regarding the adoptability of a child under section 366.26. (*Carl. R.*, at p. 1061.)

B

Based on our review of the record, we conclude there is substantial evidence to support the juvenile court's finding that J.G. is likely to be adopted within the meaning of section 366.26. Moores stated J.G. is adoptable because she is attractive, intelligent, in good health, and has a pleasant personality. She stated "there are 50 approved adoptive

families in San Diego County alone that have requested a child matching the characteristics of [J.G.]." Furthermore, J.G.'s maternal aunt and uncle want to adopt her, but do not want a guardianship. Although they had not yet been evaluated for adoption of J.G., they had been cleared by Agency for her placement with them. Also, Moores had no reason to believe they would not be approved to adopt J.G. That evidence is sufficient to support the court's finding that J.G. is likely to be adopted. In effect, Moores concluded—and the court implicitly found—that J.G. was *generally* adoptable. There are at least 50 adoptive families in San Diego County that have asked to adopt a child with J.G.'s characteristics. Furthermore, the fact J.G.'s maternal aunt and uncle want to adopt her "generally indicates [J.G.] is likely to be adopted within a reasonable time either by [them] *or by some other family*." (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) There is overwhelming evidence in the record showing J.G. is likely to be adopted within the meaning of section 366.26.

Contrary to Mother's assertion, the juvenile court's finding of adoptability was *not* based solely on the fact J.G.'s maternal aunt and uncle are willing to adopt her. (Cf. *In re Carl R., supra,* 128 Cal.App.4th at p. 1061.) Rather, construing the evidence and making all reasonable inferences to support the court's order, we conclude the court impliedly found J.G. is generally adoptable and not just adoptable by her maternal aunt and uncle. As we concluded above, there is substantial evidence to support that finding.

Even had the court considered only the willingness of J.G.'s maternal aunt and uncle to adopt her, we nevertheless would conclude there is substantial evidence to support the court's finding she is likely to be adopted. The record does not show any

9

legal impediment to their adoption of J.G. (*In re Carl R., supra,* 128 Cal.App.4th at p. 1061.) Although Agency had not, by the time of the section 366.26 hearing, completed a preliminary assessment of the eligibility and commitment of J.G.'s maternal aunt and uncle as prospective adoptive parents, that deficiency did not deprive the court of sufficient evidence on which to make a determination that J.G. was likely to be adopted by her maternal aunt and uncle (and, if not by them, by other prospective adoptive parents). The record shows they were married, employed, had no criminal history, had passed background clearances, and their home had been approved through the relative home approval process. They understood the responsibilities of becoming adoptive parents, their legal and financial rights, and wanted to raise J.G. to adulthood. The record also showed J.G. was flourishing in their home and that they had a great relationship with her. Moores stated there was every reason to believe they would ultimately be approved to adopt J.G. There is substantial evidence to support a finding that J.G.'s maternal aunt and uncle would be approved to adopt J.G., and therefore it is likely J.G. would be adopted. Any deficiencies under section 366.21, subdivision (i)(1)(D), in Agency's failure to timely prepare a preliminary assessment of their eligibility to adopt J.G. was harmless error. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 590-593.) Furthermore, contrary to Mother's assertion, the court's refusal to continue the section 366.26 hearing until Agency completed a preliminary assessment of their eligibility to adopt J.G. was not an abuse of its discretion and, even if it was, that error was harmless. (*Ibid.*) Because the court had overwhelming evidence showing it is likely J.G. will be adopted, a continuance

10

would have only resulted in delays in the court's selection of a permanent plan for J.G. and her adoption.

## II

*Substantial Evidence to Support Court's Finding That the Beneficial Parent-child Relationship Exception Did Not Apply*

Mother contends the juvenile court erred by selecting a permanent plan of adoption for J.G. because there is substantial evidence showing she had regular contact, and a beneficial parent-child relationship, with J.G.

### A

At a section 366.26 hearing, the juvenile court selects a permanent plan of care for the child. If the court finds the child is likely to be adopted, it generally must select adoption as the permanent plan unless an exception to that general rule applies, namely, "the court should not order a permanent plan of adoption when termination of parental rights would be detrimental to the child because '[t]he parents . . . have maintained regular visitation and contact with the [child] and the [child] would benefit from continuing the relationship.' " (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 50, quoting former § 366.26, subd. (c)(1)(A) (now § 366.26, subd. (c)(1)(B)(i)).)

"In the context of the dependency scheme prescribed by the Legislature, we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean *the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.* In other words, the court balances the strength and quality of the natural parent/child

11

relationship in a tenuous placement against the security and the sense of belonging a new family would confer. *If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated*." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575, italics added.)

"Interaction between [the] natural parent and child will always confer some incidental benefit to the child. The significant attachment from [the] child to [the] parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from [the] child to [the] parent." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.) "[F]or the [beneficial relationship] exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*Id.* at p. 468.) Frequent and loving contact between parent and child, without the existence

12

of a parental role to the child, may be insufficient to justify the selection of a permanent plan other than adoption. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1420.)

"Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1) [e.g., the beneficial relationship exception]." (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.) On appeal, "[w]e determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights under section 366.26, subdivision (c)." (*Id*. at pp. 297-298.) "Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

B

Mother asserts the court erred by selecting a permanent plan of adoption for J.G. because the evidence showed she had regular contact, and a beneficial parent-child relationship, with J.G. However, in so arguing, Mother misconstrues and/or misapplies the applicable substantial evidence standard of review. On appeal, we review the record to determine whether there is substantial evidence to support the court's finding (e.g., in Agency's favor) and *not* whether there is substantial evidence that could have supported a

13

contrary finding by the court (e.g., in Mother's favor). It is not our function to reweigh the evidence or make inferences or deductions from the evidence; those are questions for the juvenile court. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)

Based on our review of the record, we conclude there is substantial evidence to support the court's finding that Mother did not maintain regular visitation and contact with J.G. (§ 366.26, subd. (c)(1)(B)(i).) The court implicitly found Mother did not maintain regular visitation or contact, stating her relationship with J.G. was "sporadic" and "episodic." The record shows Moores reported that although Mother initially regularly visited and contacted J.G., her visitation and contact soon became less regular. Mother showed up at the caregiver's home without first scheduling a visit. Mother began visiting and calling J.G. less often. Mother visited J.G. only once in October and only once in November. Mother arrived at her scheduled November visit under the influence and was asked to leave. Mother did not visit J.G. in December 2013, January 2014, and February 2014. Therefore, over a five-month period, Mother visited J.G. only two times. Mother missed a scheduled visit on March 18, 2014, was late for her April 2 visit, and attended visits at Agency on April 17 and May 7. We conclude there is substantial evidence to support findings by the court that Mother's visitation with J.G. was "sporadic," or irregular, and that Mother did not carry her burden to show she maintained regular visitation and contact with J.G. Contrary to her assertion, the court was not required to disregard the import of the three-month gap in her visitation with J.G.

Likewise, we conclude there is substantial evidence to support the court's finding that Mother did not carry her burden to show J.G. had a beneficial parent-child

14

relationship with her within the meaning of section 366.26, subdivision (c)(1)(B)(i). Although J.G. lived with Mother during her first five years and presumably formed a parent-child relationship with Mother during that period, Moores reported that during J.G.'s dependency case J.G. viewed Mother more as an aunt than a parent. During visits, J.G. enjoyed playing with Mother and spending time with her, but had no trouble separating from Mother at the end of her visits. Furthermore, in Moores's opinion, J.G. would not suffer any detriment if her relationship with Mother ended and, even if J.G. would benefit from maintaining contact with Mother, that benefit would not outweigh the greater benefit she would receive from adoption. J.G. was thriving in the home of her maternal aunt and uncle. They could provide a stable and loving home in which she could grow and develop. In contrast, Mother had a history of domestic violence and substance abuse, which she had not overcome. Although in August 2012 J.G. expressed sadness she could not live with Mother, in or about January 2014 J.G. stated she wanted to remain living with her maternal aunt and uncle and liked living with them even though she also missed her visits with Mother during that time. There is substantial evidence to support a finding by the juvenile court that J.G. would not be greatly harmed if her contact and relationship with Mother ended. (Cf. *In re Beatrice M., supra,* 29 Cal.App.4th at p. 1420.)

The cases cited by Mother (e.g., *In re Bailey J.* (2010) 189 Cal.App.4th 1308) are inapposite and do not persuade us to reach a contrary conclusion. Likewise, we are not persuaded by her assertion Agency could not consider her history of substance abuse and domestic violence in recommending the juvenile court terminate her parental rights. In

15

weighing the benefit to J.G. of adoption against the benefit of maintaining a relationship with Mother, Agency and the court properly considered Mother's history of substance abuse, domestic violence, and her failure to reunify with her six other children. On appeal, we do not reweigh the evidence or make inferences contrary to the court's reasonable inferences. Because there is substantial evidence to support the juvenile court's finding that Mother did *not* carry her burden to show she maintained regular visitation and contact with J.G. and the benefit of continuing her relationship with Mother outweighed the benefit of adoption, the court properly found the beneficial parent-child relationship exception to adoption did not apply.

DISPOSITION

The order is affirmed.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

NARES, J.

16